STOLTZ, WAGNER & BROWN, a Partnership, and Coseka Resources (U.S.A.) Limited, a corporation, Plaintiffs,

v.

CIMARRON EXPLORATION COMPANY, a Corporation, Defendant.

COSEKA RESOURCES (U.S.A.) LIMITED, a Corporation, Plaintiff,

v.

CIMARRON EXPLORATION COMPANY, a Corporation, and G. Weaver Jordan, Defendants.

Nos. CIV–76–763–D, CIV–77–86–D.

United States District Court, W.D. Oklahoma.

April 10, 1981.

Philip D. Hart and Robert J. Emery, Oklahoma City, Okl., for plaintiffs.

Ralph A. Sallusti and Thomas S. Bala, Oklahoma City, Okl., for defendant.

## MEMORANDUM OPINION

DAUGHERTY, District Judge.

These cases are actions by Plaintiffs Stoltz, Wagner & Brown, a Partnership, and Coseka Resources (U.S.A.) Limited against Defendants Cimarron Exploration Company and G. Weaver Jordan, for damages sustained by Plaintiffs as a result of Defendants' alleged breach of two separate Exploration Agreements. It is asserted and the Court finds that subject matter jurisdiction is present by reason of diversity of citizenship and amount in controversy pursuant to 28 U.S.C. § 1332. As these cases concern generally the same transactions and the same parties they have been consolidated for trial without objection by the parties.

On October 3, 1975, Stoltz, Wagner & Brown (SWB) entered into an Exploration Agreement (SWB Agreement) with Cimarron Exploration Company (Cimarron) whereby Cimarron agreed to assign a one-half interest, less a certain royalty interest totaling 10% of 8/8, in various oil and gas leases in Kearny, Wichita and Greeley Counties, Kansas.[1] Cimarron further agreed to cause ten test wells to be drilled, completed, equipped and production tested on said acreage. Said Wells were to be ·drilled to a depth sufficient to test the Council Grove formation. Each test well was to be drilled on a "turnkey" basis[2] at a cost of $90,000.00 per well. SWB agreed under said Agreement to pay $700,000.00 to Cimarron. SWB paid $250,000.00 on October 22, 1975, and the remaining $450,000.00 was to be paid upon the drilling of the test wells at a rate not to exceed $45,000.00 per well.

Coseka Resources (U.S.A.) Limited (Coseka) entered into a similar Exploration Agreement (Coseka Agreement) with Cimarron on November 14, 1975. Under the Coseka Agreement Cimarron agreed to assign the remaining one-half interest in the leased acreage described above, less a certain royalty interest totaling 10% of 8/8. Cimarron further agreed to cause the same ten test wells to be drilled, completed, equipped and production tested on the leased premises. Coseka in turn agreed to pay Cimarron $900,000.00, of which $450,000.00 was to be paid on the spud date of the first well and the remaining balance was to be applied to the costs of the test wells at the rate of $45,000.00 per well.

Under the SWB Agreement, SWB agreed to sign all contracts for drilling and other third party well services and to pay all invoices for such services and all invoices incurred by Cimarron in the drilling of the test wells by making payment directly to the drilling contractor and such third parties. If, on a per well basis, the well costs totaled less than $90,000.00, SWB agreed to pay Cimarron the difference between the total well costs and $90,000.00, and if such costs exceeded $90,000.00, Cimarron agreed to pay the excess costs over $90,000.00 per well. SWB's own costs per well, however, under the SWB Agreement would not under any circumstances exceed $45,000.00, the remaining $45,000.00 per well was to come out of Coseka's share of the well costs

---

1. The leases comprised approximately 225,000 acres in Kansas, and are more fully described in an attachment to the SWB Agreement as "Plaintiff's Exhibit 1".

2. A "turnkey basis" is when a party undertakes to furnish all materials and labor and to do all work required to drill and complete a well to a certain depth and place it on production for a set amount of money. *See Continental Oil Co. v. Jones,* 177 F.2d 508 (Tenth Cir.1949).

under the Coseka Agreement with Cimarron.

Coseka paid to Cimarron the initial $450,000.00 under the Coseka Agreement and paid the remaining $450,000.00 for the ten test wells in installments. Coseka paid Cimarron $45,000.00 with the initial $450,000.00, then Coseka made three payments of $90,000.00 and one payment of $135,000.00, which totaled the entire $450,000.00 of well costs Coseka was to pay under its Agreement. Cimarron immediately forwarded to SWB the first $225,000.00 in payments made by Coseka to Cimarron for the payment of bills on the ten test wells. By April 8, 1976, Cimarron had received the entire remaining balance of $225,000.00 from Coseka under the Coseka Agreement, but Cimarron failed to forward any portion of this $225,000.00 to SWB for the payment of bills for the ten test wells.

On April 13, 1976, there was a meeting of representatives of SWB, Coseka and Cimarron. During said meeting the progress of the test well program was discussed and a letter agreement dated April 13, 1976, concerning the test wells was dictated and typed up. The letter was never signed by any of the parties although a place for all the representatives of the parties to sign was provided therein. In said typed letter agreement the parties agreed to:

"1. Release the drilling rig with the idea of coming back to drill a tenth (10) well, the location to be based on (1) the information gathered from further testing of the Bloedorn, Burch, Lindberg, Walk, Goering and Gropp, second (2) the results of a review of the Argonot completion located two (2) miles North and six (6) miles East of Tribune.

2. Do the recommended workovers on the following wells: Bloedorn, Burch, Lindberg, Walk, namely: on the Bloedorn, treat and test the Council Grove interval; on the Burch, perforate the Ft. Riley and test it (regardless of whether it is good or bad, move up and perforate the Winfield and Crider Zones); on the Lindberg, test the Winfield; on the Walk, test the Winfield.

3. In the event the average completion costs of the above three (3) wells (Walk, Lindberg and Burch) exceeds the average costs of the first four (4) wells tested (Zibell, Gropp, Goering, and Adamson), it is agreed that the participants will bear the burden of the additional costs; participants meaning COSEKA RESOURCES, LTD. AND STOLTZ, WAGNER AND BROWN."

After said meeting of April 13, 1976, Cimarron performed the workovers on the Bloedorn, Burch, Lindberg and Walk wells pursuant to the above unsigned letter agreement.

SWB inquired on several occasions in April and May of 1976 whether Cimarron had received the remaining $225,000.00 from Coseka. Cimarron upon each inquiry falsely represented to SWB that Coseka had not yet paid Cimarron the remaining balance of $225,000.00 under the Coseka Agreement. In June of 1976, SWB learned from Coseka that Coseka had paid Cimarron the remaining $225,000.00 for well costs in early April of 1976.

Upon learning in June of 1976 that Cimarron had received the final $225,000.00 of Coseka's share of well costs and had possessed the same for over two months, SWB demanded that Cimarron forward Coseka's $225,000.00 to SWB. Cimarron refused to forward any part of the $225,000.00 and Cimarron ceased operations of the test wells on July 6, 1976. The tenth test well was never commenced by Cimarron. On October 21, 1976, pursuant to the provisions of the SWB Agreement and the Coseka Agreement, SWB and Coseka removed Cimarron as operator of the ten test well program and SWB assumed the role of operator under both Agreements. Coseka paid SWB an additional $225,000.00 for the payment of the bills on the first ten test wells and now seeks reimbursement from Cimarron as it has paid this obligation twice.

After SWB succeeded Cimarron as operator of the ten test well program, SWB conducted further operations on the nine wells Cimarron had drilled. Said further operations included reperforation of the formations perforated by Cimarron and then giving the formations a "big frac."[3] These further operations by SWB on the nine test wells originally drilled by Cimarron cost $241,329.07 over the initial turnkey costs of $90,000.00 per well. Additionally, SWB drilled three additional test wells; Shaw # 1, Finn # 1 and Romano # 1; and designated them as the tenth test well under both the SWB Agreement and the Coseka Agreement. SWB then prorated the cost of said three additional wells and determined that the cost of the tenth test well was $98,058.35 or $8,058.35 over the turnkey costs of $90,000.00 per well.[4]

Under both the SWB Agreement and the Coseka Agreement, Cimarron was to receive an assignment of ten percent of the interest of SWB and Coseka in the initial ten test wells and in future wells drilled by SWB or Coseka on the leased acreage in question. Under said Agreements, on or before thirty days following the production testing of the ten test wells or any future wells, Cimarron, at its sole option, shall, either:

"Pay SWB Five (5%) per cent of the actual cost of drilling, completing and testing applicable well, and Ten (10%) per cent of the actual delay rentals paid by SWB, and acreage costs of Seventeen and One Half (17½¢) cents per acre covered by the proration unit.

OR

Deliver to SWB an an [sic] assignment of Fifty per cent (50%) interest of Cimarron in and to said proration unit."

Cimarron has purported to assign a portion of its rights and interest in the initial ten test wells and in future wells on the leased acreage, to Robert L. Wheeler as payment for his services as the attorney for Cimarron in these actions. Both the SWB Agreement and the Coseka Agreement prohibit Cimarron from assigning any of said rights and interest in the leased premises without the written consent of SWB and Coseka. Under both the SWB Agreement and the Coseka Agreement SWB and Coseka are given a preferential right of purchase over the assigned interest of Cimarron in the initial ten test wells and any future wells on the leased premises. Both SWB and Coseka advised Cimarron that they did not consent to the purported assignment to Robert L. Wheeler by Cimarron.

SWB and Coseka contend herein that Cimarron's retention of the $225,000.00 payment to pay for the costs of the initial ten test wells, and subsequent refusal to forward said $225,000.00 to SWB when it was demanded by SWB and Coseka that Cimarron do so, constituted a breach of the SWB Agreement and the Coseka Agreement. Furthermore, that the nine wells drilled by Cimarron were not completed, equipped or production tested as required by the SWB Agreement, the Coseka Agreement and the customs and usages in the oil and gas industry. SWB and Coseka further contend that when SWB terminated Cimarron as operator of the drilling program and took over as operator of the ten test well program, SWB was merely completing the contractual requirements of completing, equipping, and production testing the first nine wells and drilling, completing, equipping and production testing the tenth well which was never

---

3. A "big frac" is a method of completion of a gas well which consists of perforating the prospectively productive interval in the formation with approximately one perforation per foot and injecting into the well bore 100,000 gallons of gel water and 100,000 pounds of river sand at a rate of 100 to 150 barrels per minute. Plaintiffs assert that this is the industry standard for completion of gas wells in the Council Grove formation in the area of western Kansas, where the leased acreage in question was located.

4. All the additional operations by SWB, as operator, on the initial nine test wells in general produced unimpressive amounts of natural gas mixed with rather substantial amounts of salt water which had to be disposed of by the operator.

drilled by Cimarron; that with the additional operations by SWB, which Cimarron should have performed, the cost of the ten test wells was $1,149,387.42 which is $249,-387.42 over the turnkey price of $900,000.00, for which Cimarron agreed to drill, complete, equip and production test the ten wells. Therefore, SWB and Coseka assert that Cimarron owes them $249,387.42 under the two Exploration Agreements. SWB and Coseka further contend that the breach by Cimarron in failing to forward the $225,-000.00 to SWB for the payment of well costs and the failure to drill the ten test wells pursuant to the SWB and Coseka Agreements were material breaches of both the SWB and Coseka Agreements thereby excusing SWB and Coseka from performance under said Exploration Agreements, particularly excusing performance as to the assignment of a 10% interest to Cimarron on the initial ten test wells and in future wells drilled on the leased premises. SWB and Coseka further contend that the assignment of part of Cimarron's interest in the ten test wells and future wells to Wheeler is void as SWB and Coseka object to such an assignment and both SWB and Coseka have preferential rights of purchase under their respective Agreements with Cimarron. Coseka contends that G. Weaver Jordan (Jordan), President and sole stockholder of Cimarron, organized Cimarron for the sole purpose of entering into the SWB and Coseka Agreements. That Cimarron and Jordan are one in the same. That Jordan individually diverted the $225,000.00, paid by Coseka for well costs on the initial ten test wells, for Jordan's own personal use. Therefore, Coseka contends that Jordan should be held personally liable for the payment of the $225,000.00 owed to Coseka.

Cimarron contends that it had not agreed to complete, equip, and test any formation other than the Council Grove formation as to the initial ten test wells; that Cimarron agreed to do such work in other formations under and by a modification of the SWB and Coseka Agreements as evidenced by the unsigned April 13, 1976 letter and the subsequent actions and course of conduct of the parties. Cimarron further contends that it complied with both the SWB and Coseka Agreements as modified by the April 13, 1976 letter. That SWB and Coseka knew that Cimarron was performing under the April 13, 1976 modification of the respective Exploration Agreements and did not make any objections, although SWB and Coseka were furnished daily reports of the drilling activities. Cimarron further contends that the additional expenditures later made by SWB as operator were not approved or consented to by Cimarron and that the expenditures were unnecessary and imprudent and beyond the contracts of the parties. Cimarron further contends that it performed all it was required to do under the SWB and Coseka Agreements and that Cimarron has earned under said Agreements $191,180.14, plus expenses, which is the difference between the actual drilling costs for the initial ten test wells and the turnkey price of $900,000.00. Cimarron further contends that Cimarron did not transfer the $225,000.00 it received from Coseka to SWB, because Cimarron anticipated a profit of the initial nine wells and Cimarron also estimated a profit on the tenth well to be drilled. Cimarron further contends that its elective rights to participate in all wells drilled on the leased acreage are alive and open. Furthermore, Cimarron contends that SWB seized certain personal property which belonged to Cimarron when SWB took over as operator. Finally, Cimarron contends that the preferential rights of purchase granted to Coseka and SWB over the assigned interest of Cimarron in the wells drilled on the leased acreage are unenforceable.

Cimarron has counterclaimed against Coseka and SWB seeking $191,180.14 in profits under the SWB and Coseka Agreements for the drilling of the nine test wells and for lost profit on a tenth test well. Cimarron also seeks $5,593.31 for cleanup and other expenses incurred at the drill sites of the nine test wells advanced by Cimarron under the turnkey contract and not paid by SWB.

SWB and Coseka counter that there was never any modification of the Exploration

Agreements as a result of the April 13, 1976 conference. SWB and Coseka further contend that Cimarron materially breached the Exploration Agreements thereby forfeiting its right to any profits under the Exploration Agreements. SWB and Coseka further contend that the equipment taken by SWB at the drill sites belonged to SWB and Coseka as they had paid for it under the Exploration Agreements.

The instant case presents several issues to the Court for decision as follows:

1. Did the April 13, 1976 unsigned letter agreement between the parties, and their subsequent actions and course of conduct, constitute a modification of both the SWB Agreement and the Coseka Agreement?

2. Did Cimarron materially breach the SWB and Coseka Agreements by withholding Coseka's $225,000.00 payment after Coseka and SWB demanded that Cimarron forward the same to SWB and/or by not completing and production testing the nine test wells as a prudent operator would have done?

3. If Cimarron has materially breached the two Exploration Agreements, how does such a breach affect its rights to alleged profits from the turnkey drilling contracts?

4. If Cimarron has materially breached the two Exploration Agreements, how does said breach affect Cimarron's elective rights in the first ten wells and in future wells drilled on the leased premises?

5. If Cimarron has materially breached the two Exploration Agreements, are Coseka and SWB entitled to payment by Cimarron, for the additional drilling operations performed by SWB as operator on the first nine test wells and for the expenditures by SWB and Coseka in drilling the tenth test well?

6. Are SWB and Coseka entitled to have the claims of Cimarron quieted as to the first ten wells and as to all future wells to be drilled on the leased premises?

7. Are SWB and Coseka liable to Cimarron for the fair market value of the equipment removed from the leased premises by SWB?

8. Was the assignment of certain of Cimarron's interest in the ten test wells and in future wells to Robert L. Wheeler valid in view of the preferential right of purchase granted Coseka and SWB as to such interest under the two Exploration Agreements?

9. Is Cimarron the alter ego of G. Weaver Jordan so as to make Jordan personally liable for any damages awarded Plaintiffs in the instant action?

10. Are any of the parties herein entitled to attorney's fees?

The Court will deal with each of these issues seriatim.

### THE APRIL 13, 1976 UNSIGNED LETTER

SWB and Coseka contend that Cimarron breached the two Exploration Agreements by not completing, equipping and production testing the first nine test wells as a prudent operator would have under the circumstances. SWB and Coseka contend that a prudent operator would have completed the test wells in question with a "big frac" and would have completed the same in the upper zones if there was no showing of gas in the Council Grove formation, all for the agreed turnkey figure. SWB and Coseka further contend that the unsigned April 13, 1976 letter did not constitute a modification of the obligations of Cimarron under both Exploration Agreements, as said letter was unsigned and the parties reached no agreement.

Cimarron contends that it completed the test wells with a localized fracture (little frac),[5] because a big frac would mix with an

---

5. A "little frac" is a limited entry-type of technique with fewer perforations than the big frac and pumping the gel water into the hole at a rate not over twice the number of holes, i.e., if you had ten perforations, then pump 20 barrels of water a minute. Cimarron attempted this

upper layer of siltstone which was almost all salt water. It was Cimarron's contention that due to the condition of the Council Grove formation a big frac would produce a lot of salt water and little gas. Cimarron further contends that it was only required to drill and complete in the Council Grove formation under the turnkey agreement and the completion in the upper zones was not included in the turnkey price. Cimarron further contends that SWB and Coseka were aware of the problems connected with completing the wells with a big frac and agreed that the completion of upper zones was not contemplated under the turnkey contracts which is why the April 13, 1976 letter was dictated, as a modification of the two Exploratory Agreements, to cover exploration of the upper zones.

The evidence in the instant case indicates and the Court finds that the terms set out in the April 13, 1976 unsigned letter were agreed to between the parties and that when executed it constituted a modification of the SWB and Coseka Agreements concerning the completion and testing of the upper zones in the Bloedorn, Burch, Lindberg and Walk wells and the delay in the drilling of the tenth test well. Both Harvey L. Sarles (Sarles) and Bob Posey (Posey) testified that Bob Boulware (Boulware) of Coseka, and Cycil Wagner and Jack Brown (Brown) of SWB dictated the April 13, 1976 letter at the meeting of all the parties. Both Sarles and Posey further testified that the Coseka and SWB representatives agreed to the little frac completion of the wells in question because of the siltstone problem and showed agreement with the terms set out in the April 13, 1976 letter. Boulware, of Coseka, testified that the letter was dictated primarily by Brown of SWB and that there was a general consensus of agreement as to the completion and testing of the upper zones and the release of the drilling rig with the idea of coming back and drilling a tenth well later. Boulware testified that there was some disagreement with the additional costs formula set out in paragraph 3 of said letter,

otherwise there was general agreement among all parties.

■ It is clear under Oklahoma law that a written contract may be modified by an executed oral agreement. *Watt Plumbing A.C. & E., Inc. v. Tulsa Rig, Reel & Mfg. Co.*, 533 P.2d 980 (Okl.1975); *Dewberry v. Universal C.I.T. Credit Corp.*, 415 P.2d 978 (Okl.1966); *Stolzer v. Beer*, 383 P.2d 686 (Okl.1963); *Greenwalt v. Labenne*, 167 Okl. 508, 30 P.2d 873 (1934); 15 Okla.Stat.1971 § 237. The unsigned letter is not a written agreement as none of the parties to be charged signed said letter. But it is evidence of an oral agreement reached between Coseka, SWB and Cimarron at the April 13, 1976 meeting to modify the SWB and Coseka Agreements. Under the modified agreements the tenth test well was to be drilled at a later date at a location to be selected after further testing of the first nine test wells and the drilling rig released. Furthermore, Cimarron was to back up in the Bloedorn, Burch, Lindberg, and Walk wells and test the upper zones in the holes. The fact that the April 13, 1976 agreement was prepared indicates that Coseka and SWB were satisfied with the work performed by Cimarron so far on the first nine test wells and were satisfied that Cimarron had substantially performed its obligations under the turnkey agreement as to the first nine wells. Otherwise there would not have been any need to discuss or enter into a new agreement modifying the SWB and Coseka Agreements concerning what was to be done in the upper zones and regarding the tenth well.

The testimony of Sarles, Posey and Boulware along with the preparation of the April 13, 1976 letter and other evidence persuades this Court that as of April 13, 1976 SWB and Coseka were generally satisfied that Cimarron had drilled, completed, equipped and tested the first nine test wells in accordance with the SWB and Coseka Agreements. Furthermore, the evidence shows that SWB, Coseka and Cimarron reached an oral agreement as to the delay

instead of the big frac allegedly because there was a layer of siltstone on the top of the Coun-

cil Grove formation which was about 100% water.

of the drilling of the tenth well and release of the drilling rig and as to the testing and completion in the upper zones in the Bloedorn, Burch, Lindberg and Walk wells.

■ Merely having an oral agreement is inadequate to modify a written agreement. 15 Okla.Stat.1971 § 237. Said oral agreement must be executed. *Dewberry v. Universal C.I.T. Credit Corp., supra.* The testimony of James R. Marshall, a petroleum engineer who testified on behalf of SWB; of Brown of SWB; and of Sarles indicate that the work in the upper zones of the Bloedorn, Burch, Lindberg, and Walk wells, as contemplated by the April 13, 1976 oral agreement, was completed by Cimarron before SWB relieved Cimarron as operator in July of 1976. Boulware testified that the drilling rig was released and the tenth well was delayed and to be drilled at a later date as per the April 13, 1976 oral agreement. Accordingly, the evidence shows that the oral agreement of April 13, 1976, as evidenced by the unsigned letter, was in fact executed and therefore said oral agreement was a valid modification of the written SWB and Coseka Agreements. *Watt Plumbing A.C. & E., Inc. v. Tulsa Rig, Reel & Mfg. Co., supra; Dewberry v. Universal C.I.T. Credit Corp., supra; Stolzer v. Beer, supra; Greenwalt v. Labenne, supra;* 15 Okla.Stat.1971 § 237.

■ In view of the foregoing the Court finds and concludes that an oral agreement was reached between the parties on April 13, 1976 and that said oral agreement was executed by Cimarron so as to validly modify the turnkey arrangement of the SWB and Coseka Agreements. Furthermore, the Court finds and concludes that Cimarron satisfied the SWB and Coseka Agreements as far as the drilling, completing, equipping and testing of the nine test wells drilled, is concerned.

## CIMARRON'S FAILURE TO FORWARD COSEKA'S $225,000.00 PAYMENT TO SWB FOR THE PAYMENT OF BILLS ON THE LAST FIVE TEST WELLS

SWB and Coseka contend that Cimarron was obligated under both the SWB and the Coseka Agreements to forward Coseka's share of the ten test well costs to SWB, so SWB could pay the bills as they came due for the ten test wells. SWB and Coseka contend that this obligation was implicit under the SWB and Coseka Agreements and said obligation was further indicated by the conduct of Cimarron in immediately forwarding the first $225,000.00 of Coseka's well cost payments to SWB. SWB and Coseka further contend that Cimarron materially breached the SWB and Coseka Agreements when Cimarron failed to forward the $225,000.00 in question to SWB so SWB could pay the bills incurred by Cimarron in the drilling, completing, equipping and testing of the initial test wells.

Cimarron contends that its failure to forward said $225,000.00 to SWB was not a breach of the Agreements as Cimarron anticipated a profit from the test well program; and that SWB owed Cimarron $50,000.00 for lease acquisition costs; and that SWB owed Cimarron money as a commission from the sale of the one-half of the exploration deal to Coseka. The commission question, however, was settled between SWB and Cimarron on April 22, 1976, long before the demand of SWB and Coseka that Cimarron forward the $225,000.00 to SWB.

Neither the SWB or the Coseka Agreement specifically state that Cimarron was to forward the money paid by Coseka for well costs to SWB for the payment of bills. As there is some question as to whether or not Cimarron was required to forward to SWB Coseka's one-half of the well costs and as neither Agreement specifically states what is to happen with Coseka's one-half of the well costs, other than it is to go toward the cost of the test wells up to $45,000.00 per well, the Court may look to the conduct of the parties and the construction the parties have placed on the contract by their actions. *Federal National Bank and Trust Company of Shawnee, Okla. v. Owen,* 389 F.2d 457 (Tenth Cir.1968); *Paterson v. Southwestern Bell Telephone Co.,* 411 F.Supp. 79 (E.D.Okl.1976); *Sykes v.*

*C.F. Dillingham*, 318 P.2d 416 (Okl.1957); *Principle Films, Inc. v. Wichita Mountains Easter Sunrise Service Association, Inc.*, 288 P.2d 734 (Okl.1955).

In the instant case the conduct of Cimarron strongly indicates that the well cost money paid by Coseka was to be forwarded to SWB so that SWB could pay the bills incurred as a result of the drilling of the test wells in question. Cimarron forwarded the first $225,000.00 of Coseka's well cost money to SWB as it was received from Coseka. Cimarron then without satisfactory explanation stopped forwarding Coseka's payments. When SWB inquired of Cimarron concerning the rest of Coseka's well cost payments, Cimarron's agent falsely told SWB that Coseka had not yet paid said money to Cimarron, although it had been paid in full by April of 1976. Furthermore, the SWB and Coseka Agreements imply from their wording that SWB was to receive the well cost payments of Coseka. Said Agreements provide that SWB was to sign all contracts for drilling and third-party services and that SWB was to pay all well costs up to $90,000.00 per well, but SWB's cost per well was not to exceed $45,000.00 per well. Coseka was required to pay $45,000.00 per well for well costs. Implicit in these Agreements is that Cimarron was to forward to SWB Coseka's share of the well costs so that SWB could pay all the bills and so SWB's costs would not exceed $45,000.00 per well. Accordingly, the Court finds and concludes that Cimarron was required, under the Coseka and SWB Agreements, and under the interpretation placed on said Agreements by Cimarron's conduct, to forward the $225,000.00 in question, which constituted one-half of Coseka's well costs, to SWB so that SWB could pay the bills incurred by the drilling of the wells. Therefore, Cimarron's failure to forward said $225,000.00 to SWB constituted a material breach of the SWB and Coseka Agreements. The breach is material because it goes to the essence of the turnkey agreement. SWB was to pay all the bills under the turnkey agreement and SWB's maximum costs under the agreements was not to exceed $45,000.00 per well. If Cimarron were allowed not to forward said payments then SWB would either not be able to pay the bills incurred by the drilling program or SWB's cost would exceed $45,000.00 per well.

■ Cimarron's attempts to excuse its breach are unconvincing. There could be no anticipated profits under the turnkey agreement until "all bills for drilling, completing and testing had been paid" (SWB Agreement page 3) and it was determined that the cost on a per well basis was less than $90,000.00. Furthermore, Cimarron was not permitted to keep anticipated profits under the SWB Agreement, rather Cimarron was to send invoices to SWB on a per well basis and then SWB was to pay such invoices. Additionally, the claimed $50,000.00 in lease acquisition costs was a separate matter and not connected to the turnkey agreement. Furthermore, the alleged commission owed Cimarron by SWB was fully settled and paid on April 22, 1976 long before the demand was made by SWB and Coseka that Cimarron forward the $225,000.00 to SWB. Accordingly, Cimarron had no proper basis to retain the $225,-000.00 and Cimarron therefore materially breached the Coseka and SWB Agreements.

■ As to SWB and Coseka's contention that Cimarron breached the Agreements by not completing, equipping and production testing the first nine wells as a prudent operator would have done, the Court finds that this contention is not supported by the evidence. As pointed out above the evidence indicates that SWB and Coseka were generally satisfied with the drilling operations by Cimarron at the April 13, 1976 meeting. It was not until SWB and Coseka discovered that Cimarron had withheld $225,000.00 of Coseka's well cost money that SWB and Coseka considered the Agreements to have been breached by Cimarron. Though perhaps arguable, the Court finds and concludes that Cimarron's operations were those of a prudent operator when considered within the framework of the Exploration Agreements.

THE EFFECT OF CIMARRON'S BREACH OF THE SWB AND COSEKA AGREEMENTS ON CIMARRON'S RIGHT TO ALLEGED PROFITS FROM THE TURNKEY DRILLING CONTRACTS

Cimarron contends that it is entitled to $191,180.14 in profits from the ten test well drilling program under its turnkey arrangement with SWB and Coseka. Cimarron further claims for unpaid expenses regarding the nine test wells it drilled, $2,285.01 for cleanup and transport of well site, $650.00 for pumper wages and $278.10 for cost incurred in connection with the Baum well and $2,380.20 for costs incurred in connection with the Shaw well. Cimarron has thus counterclaimed for judgment in the amount of $196,773.45.

In Oklahoma it is the general rule that a contract must be performed according to the terms of the agreement before a party can have any right of action. *Houser v. Sheehan*, 389 P.2d 94 (Okl.1964); *Messick v. Johnson*, 167 Okl. 463, 30 P.2d 176 (1934). A party seeking recovery on a contract has the burden of showing that the contract was performed according to its terms. *Camp v. Black Gold Petroleum Co.*, 195 Okl. 130, 154 P.2d 769 (1944). A partial failure of performance is grounds for rescission of a contract when such failure defeats the object of the contract or when it concerns a matter of such importance that the contract would not have been made if default in that particular area had been expected. *Houser v. Sheehan, supra.* If a party seeking recovery was unable or unwilling to perform his portion of the contract, then said party cannot require performance by the other party. *See Owens v. Automotive Engineers*, 208 Okl. 251, 255 P.2d 240 (1953); *Messick v. Johnson, supra.*

In the instant case Cimarron clearly failed in its performance under the Exploration Agreements when Cimarron kept $225,000.00 of well cost money paid by Coseka. SWB would not have entered into the SWB Agreement if SWB had known that Cimarron was going to keep one-fourth of the well cost money for in that case SWB's cost per well would exceed $45,000.00 which was the maximum amount SWB was willing and had contracted to pay per well. As Cimarron failed to perform its part of the SWB and Coseka Agreements and in doing so materially breached both Agreements, Cimarron has no right of action against SWB or Coseka for the recovery of alleged profits under the turnkey agreements. *Houser v. Sheehan, supra; Owens v. Automotive Engineers, supra; Messick v. Johnson, supra.*

Cimarron may, however, recover under the doctrine of quantum-meruit. Where a contract has been partially performed, the party at fault can still recover in quantum-meruit for work performed. *Burke v. McKee*, 304 P.2d 307 (Okl.1956). Cimarron may recover in quantum-meruit the reasonable value of the benefit it has conferred on SWB and Coseka. *Burke v. McKee, supra.*

In the instant case SWB and Coseka have paid for all drilling services done by third parties and paid all costs incurred by Cimarron in connection with the drilling, completing, equipping and testing of the nine wells drilled by Cimarron, except for the $5,593.31 now claimed by Cimarron as its unpaid expenses connected with the wells it drilled. SWB and Coseka have paid the reasonable value of the benefit conferred by Cimarron as they have paid the full cost of the nine wells drilled by Cimarron, except for $5,593.31.

In view of the foregoing, the Court finds and concludes that Cimarron is not entitled to recover alleged profits in the amount of $191,180.14 under the turnkey Agreements involved herein. The Court further finds and concludes that Cimarron is entitled to recover from SWB and Coseka the sum of $5,593.31 as the value of the services performed by Cimarron to the benefit of SWB and Coseka for which Cimarron has not yet been reimbursed by SWB and Coseka.

EFFECT OF CIMARRON'S BREACH OF THE SWB AND COSEKA AGREEMENTS ON CIMARRON'S ELECTIVE RIGHTS IN THE FIRST TEN WELLS AND ALL FUTURE WELLS DRILLED ON THE LEASED PREMISES

Under the SWB and Coseka Agreements Cimarron was entitled to elect to pay a portion of the cost of drilling, completing and testing of a well and in return SWB and Coseka were to assign a 10 percent interest in said well. The election was to take place within 30 days following the production testing of a particular well. Said elective rights pertained to the first ten test wells to be drilled by Cimarron and to all future wells drilled on the leased premises.

Cimarron makes no claim to any interest in the Zibel, Goering, Gropp, Walk, Burch and Roth wells, as Cimarron has tendered to SWB and Coseka written assignments of Cimarron's interest. Cimarron has paid to the Clerk of this Court its proportionate share of well costs for the Romano #1 well pending the outcome of this litigation. Cimarron contends that its elective rights with respect to all other wells drilled on the leased premises or to be drilled on the leased premises remain open and viable. Cimarron asks this Court to order SWB and Coseka to deliver to Cimarron assignments of elected interests to Cimarron as required in the SWB and Coseka Agreements.

As pointed out above before a party has a right to seek recovery under a contract said party must show that it has performed the contract according to its terms. See *Houser v. Sheehan, supra; Owens v. Automotive Engineers, supra; Camp v. Black Gold Petroleum Co., supra; Messick v. Johnson, supra.* It has been previously determined by the Court that Cimarron materially breached both the SWB and Coseka Agreements by retaining $225,000.00 of Coseka's share of the well costs money and attempting to conceal from SWB the fact that Coseka had paid said well costs money. Therefore, under the authorities cited above, the Court finds and concludes that Cimarron is not entitled to enforce its elective rights under the SWB and Coseka Agreements by reason of Cimarron's material breach of said Agreements.

ARE COSEKA AND SWB ENTITLED TO PAYMENT BY CIMARRON FOR THE ADDITIONAL DRILLING OPERATIONS PERFORMED BY SWB, AS OPERATOR, ON THE FIRST NINE TEST WELLS AND FOR THE EXPENDITURES BY SWB AND COSEKA IN DRILLING THE TENTH TEST WELL

SWB and Coseka contend that they are entitled to $249,387.42 from Cimarron for additional drilling operations on the first nine test wells drilled by Cimarron and for expenditures in drilling the tenth test well which was never drilled by Cimarron.

With respect to the additional drilling operations performed by SWB on the first nine test wells drilled by Cimarron, this Court has previously determined that Cimarron drilled, completed, equipped and tested said nine wells under the SWB and Coseka Agreements as modified by the April 13, 1976 agreement between the parties. Furthermore, the evidence indicates that SWB and Coseka considered the actions of Cimarron prudent and proper under the Agreements as to the first nine test wells up until June of 1976 when it was discovered that Cimarron was withholding from SWB $225,000.00 of the well costs money paid by Coseka. As the evidence indicates that Cimarron satisfactorily performed the drilling, completing, equipping and testing of the first nine wells under the SWB and Coseka Agreements as modified, the money spent by SWB and Coseka on additional drilling operations were expenses incurred by SWB and Coseka on their own and not within the SWB or Coseka Agreements, as modified. A party cannot recover more than the amount he might have gained by full performance under a contract. *Osborn v. Commanche Cattle Industries, Inc.*, 545 P.2d 827 (Okl.App.1975).

As to the expenditures by SWB and Coseka in drilling what was designated as the tenth well,[6] SWB and Coseka would be entitled to their costs in the drilling of the tenth well over the original $90,000.00 turnkey price under the benefit of the bargain rule. *See Interstate United Corporation v. White,* 388 F.2d 5 (Tenth Cir.1967); *Osborn v. Commanche Cattle Industries, Inc., supra; Eysenbach v. Cardinal Petroleum Co.,* 110 Okl. 12, 236 P. 10 (1925). In the instant case, however, SWB and Coseka have materially deviated from the original agreement in drilling three wells and designating them all as the tenth well and then attempting to pro-rate the cost of each well. The drilling of three test wells as a tenth well was clearly not called for by either the SWB or Coseka Agreements, or by said Agreements as modified by the April 13, 1976 oral executed agreement. As SWB and Coseka have chosen not to drill a tenth test well as contemplated by the parties in the SWB and Coseka Agreements, as modified, they are not entitled to the benefits of a new and different bargain they unilaterally initiated and to any additional costs over $90,000.00 on a tenth well.

In view of the foregoing the Court finds and concludes that SWB and Coseka are not entitled to recover from Cimarron for the money spent for additional drilling operations on the first nine wells drilled by Cimarron. The Court further finds and concludes that SWB and Coseka are not entitled to recover from Cimarron the sum of $8,058.35 which represents the pro-rated difference between the amount expended by SWB and Coseka in drilling said three wells, and the turnkey price agreed to be paid to Cimarron by SWB and Coseka for drilling the tenth test well, which was never drilled as such by any of the parties.

## SWB AND COSEKA'S QUIET TITLE ACTION

SWB and Coseka seek a judgment of this Court quieting SWB and Coseka's title in the first ten wells and as to all future wells drilled on the leased premises, as to any

claim made by Cimarron pursuant to Cimarron's elective rights under the SWB and Coseka Agreements.

As pointed out above, Cimarron materially breached both the SWB and the Coseka Agreements and therefore Cimarron cannot enforce its elective rights under said Agreements. A partial failure of performance by a party is grounds for rescission of a contract when such failure defeats the object of the contract or it concerns a matter of such importance that the contract would not have been made if default in that particular area had been expected. *Houser v. Sheehan, supra; Wright v. Fenstermacher,* 270 P.2d 625 (Okl.1954). As pointed out above, Cimarron's withholding from SWB of Coseka's payment of $225,000.00 for well costs and attempt to conceal from SWB that the $225,000.00 was ever paid by Coseka, constituted a matter of such importance that the Agreements would not have been made had SWB and Coseka contemplated a default of this nature by Cimarron. Therefore, SWB and Coseka would be entitled to rescind their Agreements with Cimarron as to the elective rights. Accordingly, the Court finds and concludes that Cimarron has no interest in the ten test wells or in any other well drilled or to be drilled on the leased premises by reason of Cimarron's material breach of the Agreements. Therefore, SWB and Coseka are entitled to judgment quieting title against the interest claimed in said wells by Cimarron. Furthermore, Cimarron should reassign to SWB and Coseka any interest in any well in its possession under the Exploration Agreements involved herein, and the Clerk of this Court should pay to Cimarron the money it deposited with the Court for its share of the Romano # 1 well. *See Houser v. Sheehan, supra; Wright v. Fenstermacher, supra.*

## CIMARRON'S CLAIM FOR THE FAIR MARKET VALUE OF EQUIPMENT REMOVED FROM THE TEST WELL SITES BY SWB AND COSEKA

Cimarron claims that SWB and Coseka owes it for the fair market value of equip-

---

**6.** SWB and Coseka drilled three wells; Shaw # 1, Firm # 1 and Romano # 1; and designated them as the tenth well after Cimarron's breach. SWB and Coseka have pro-rated the costs of these wells so the cost alleged is as if one well were drilled.

ment removed from the test well sites by SWB and Coseka after they removed Cimarron as operator under the program.

■ Cimarron's contention is without merit. Under both the SWB and Coseka Agreements SWB was to pay all bills, sign all contracts and purchase all equipment using money put up by SWB and Coseka up to $90,000.00 per well. The equipment kept by SWB and Coseka was paid for by SWB and Coseka and naturally belonged to SWB and Coseka under their respective Agreements with Cimarron. Moreover, Cimarron wholly failed to produce any evidence as to what equipment they claimed and what the fair market value of the same was. Accordingly, the Court finds and concludes that Cimarron is not entitled to recover from SWB and Coseka for equipment removed from the well sites by SWB and Coseka.

## ASSIGNMENT OF CERTAIN OF CIMARRON'S INTEREST IN THE TEST WELLS TO ROBERT L. WHEELER

Cimarron assigned some of its interest in the wells in question to Robert L. Wheeler, Cimarron's attorney, in violation of both the SWB and Coseka Agreements which gave SWB and Coseka a preferential right of purchase of Cimarron's assigned interest.

In view of the Court's earlier conclusions that Cimarron lost its elective rights under the SWB and Coseka Agreements because of Cimarron's material breach, and in view of the Court quieting SWB and Coseka's title as far as the Cimarron interest is concerned, this point is now moot. Cimarron has no interest to assign to Robert L. Wheeler by Cimarron. Furthermore, under both the SWB and Cimarron Agreements Cimarron could not assign its interest in any well without the written consent of SWB and Coseka. SWB and Coseka were given a preferential right of purchase as to Cimarron's interest by both Agreements. Neither SWB or Coseka gave their consent to the assignment to Wheeler. Therefore, said assignment was ineffective under both said Agreements and Cimarron has not presented any persuasive reason why the

assignability provisions of the SWB and Coseka Agreements should not be enforced.

■ Accordingly, this Court finds and concludes that Robert L. Wheeler took nothing by assignment from Cimarron as Cimarron had no interest to assign due to Cimarron's material breach of the SWB and Coseka Agreements.

## PERSONAL LIABILITY OF G. WEAVER JORDAN FOR ANY JUDGMENT AGAINST CIMARRON AND IN FAVOR OF SWB OR COSEKA

Coseka in its Complaint in CIV–77–86–D (which was consolidated with CIV–76–0763–D for trial) asks that G. Weaver Jordan (Jordan) be found to be the alter ego of Cimarron and thereby personally liable for any judgment against Cimarron in favor of Coseka. At the close of the trial of the instant case the co-plaintiff SWB moved that the pleadings be amended to conform with the proof and that Jordan be found to be the alter ego of Cimarron and thereby held personally liable for any judgment against Cimarron and in favor of SWB. The Court granted said Motion of SWB.

In Oklahoma a corporate entity may be disregarded under the alter ego theory if the corporate existence is used to do wrong, perpetuate fraud, or commit a crime and the individual shareholder may be held personally liable. See *Robertson v. Roy L. Morgan,* 411 F.2d 1041 (Tenth Cir.1969); *Palmer v. Stokely,* 255 F.Supp. 674 (W.D. Okl.1966); *Sautbine v. Keller,* 423 P.2d 447 (Okl.1966).

In the instant case, Cimarron wrongfully retained $225,000.00 paid by Coseka as one-half of its share of well costs for the ten test wells. Cimarron was to forward said $225,000.00 to SWB but failed and refused to do so. The $225,000.00 was diverted to the personal use of Jordan. Jordan cannot recall what happened to $50,000.00 of said money. At least $175,000.00 of the money was placed in Jordan's personal safety deposit box at Fidelity Bank, N.A. The evidence further indicates that some of the missing $225,000.00 may have been used by

Jordan for a down payment on his personal residence. Jordan is the sole officer, director, shareholder and employee of Cimarron. The evidence shows that Jordan used his position to divert the $225,000.00 from its intended purpose, the payment of bills in the test well drilling program, to his personal use.

■ In view of the foregoing, the Court finds and concludes that Jordan is the alter ego of Cimarron and that the corporate existence was used to do wrong, namely, divert the $225,000.00 paid by Coseka from its intended purpose to the personal use of Jordan. Accordingly, the corporate existence of Cimarron should be disregarded and Jordan should be held personally liable for any judgment in the instant case against Cimarron and in favor of Coseka or SWB.

## ATTORNEY'S FEES

Both sides in this litigation have asked that attorney's fees be assessed against the opposing side.

■ Attorney's fees are not recoverable under Oklahoma law unless they are provided for by contract or by statute. *Misco Leasing, Inc. v. Keller,* 490 F.2d 545 (Tenth Cir.1974); *Security Insurance Co. of New Haven v. White,* 236 F.2d 215 (Tenth Cir.1956); *Joy v. Giglio,* 208 Okl. 50, 254 P.2d 351 (Okl.1953). Neither side has presented any statute which would allow the assessment of attorney's fees in the instant case. Nor are the payment of attorney's fees provided for by the SWB or Coseka Agreements. In this connection Oklahoma follows the American rule which does not allow attorney fees absent a statute or contract, but a Court in the exercise of its equitable powers may award attorney's fees when the interest of justice so requires. This is usually when a successful party shows his opponent has acted in bad faith, vexatiously, wantonly or for oppressive reasons. *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *see also, Lincoln Income Life Ins. Co. v. Harrison,* 71 F.R.D. 27 (W.D.Okl.1976). In the instant case the Court in the exercise of its equitable powers and discretion declines to award attorney's fees to any party. Accordingly, the Court finds and concludes that neither side is entitled to an attorney's fee in the instant litigation.

## CONCLUSION

In view of the foregoing and after due consideration of all the evidence, arguments and briefs of the parties, the Court finds and concludes that the SWB and Coseka Agreements were modified by an oral agreement entered into by the parties, the terms of which are evidenced by the April 13, 1976 unsigned letter, which oral agreement has been executed; that Cimarron materially breached the SWB and the Coseka Agreements by wrongfully withholding from SWB, Coseka's $225,000.00 payment for one-half of its well costs in the drilling program; that as Cimarron breached the SWB and Coseka Agreements Cimarron does not have a right of action against SWB or Coseka for alleged profits under the turnkey drilling Agreements, and has lost its elective rights under the SWB and Coseka Agreements by reason of such breach; that the additional drilling operations performed by SWB were not required under the SWB and Coseka Agreements to be performed by Cimarron and therefore Cimarron is not liable for the costs of said operations; likewise Cimarron is not liable for the costs over $90,000.00 expended in the drilling of the tenth test well as a tenth well was never drilled within the contemplation of the Agreements; that SWB and Coseka are entitled to have the claims of Cimarron quieted as to the wells drilled on the leased acreage and as to elective rights under the Agreements; that SWB and Coseka paid for the equipment used in drilling the test wells and said equipment belongs to SWB and Coseka and therefore Cimarron is not entitled to be paid for equipment taken from the well sites by SWB or Coseka; that Cimarron had no interest in the wells or acreage to assign to Robert L. Wheeler and therefore Wheeler took nothing by said assignment; that Cimarron is the alter ego of G. Weaver Jordan and the corporate existence was used to

wrongfully divert Coseka's payment of $225,000.00 for one-half of its well costs to Jordan's personal use and therefore G. Weaver Jordan is personally liable for any damages awarded SWB or Coseka against Cimarron; neither Plaintiffs nor Defendants are entitled to attorney's fees in the instant action under Oklahoma law.

Accordingly, judgment should be entered as follows: Against Cimarron and G. Weaver Jordan personally and in favor of Coseka in the amount of $225,000.00 to reimburse Coseka for this amount of its share of the well costs which was wrongfully diverted by Jordan and Cimarron; against SWB and Coseka and in favor of Cimarron on SWB's and Coseka's claim for $249,387.42 for additional operations on the first nine wells and for the overcost in drilling a tenth well; against Cimarron and in favor of SWB and Coseka on Cimarron's counterclaim for alleged profits from the turnkey program, and on Cimarron's claim that its elective rights are open and viable, and on Cimarron's attempted assignment to Robert L. Wheeler, and on Cimarron's claim for the fair market value of equipment taken from the well site by SWB and Coseka after SWB relieved Cimarron as operator; against SWB and Coseka and for Cimarron on Cimarron's claim for unreimbursed expenses incurred in drilling the test wells in the amount of $5,593.31. Furthermore, judgment should be entered quieting the title of SWB and Coseka in the wells drilled on the leased premises and the acreage set out in the SWB and Coseka Agreements, as to all claims by Cimarron.

Plaintiffs will prepare an appropriate judgment in accordance with the above, obtain Defendants' approval (as to form) and present the same to the Court within ten (10) days from the date hereof for signature and entry herein.